# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TECHNICAL SERGEANT    *
THOMAS D. CUMBIE,

    Plaintiff,                *

    v.                        *    **Civil No. 8:24-cv-2505-CDA**

TROY MEINK,                *
Secretary,
United States Air Force,    *

    Defendant.[1]             *    *    *    *

## MEMORANDUM OPINION

BEFORE THE COURT are dueling motions for summary judgment filed by the Secretary of the United States Air Force Troy Meink ("Defendant" or "Secretary") and Plaintiff Technical Sergeant Thomas D. Cumbie.[2]  ECFs 33, 38.  The parties dispute whether the Secretary properly denied Cumbie's application for Combat-Related Special Compensation ("CRSC").  ECF 1; *see* Administrative Record, ECF 33-1 ("AR"), at 4-11.[3] The motions are ripe for disposition, and no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2025).  For the following reasons, Cumbie's Cross-Motion for Summary Judgment

---

[1] Cumbie filed this case against Frank Kendall III, the Acting Secretary of the Air Force, on August 28, 2024.  ECF 1.  Troy Meink became the Secretary of the Air Force on May 16, 2025.  Accordingly, Secretary Meink has been substituted as this case's Defendant pursuant to Federal Rule of Civil Procedure 25(d).  *See* Fed. R. Civ. P. 25(d).

[2] On November 15, 2024, the parties consented to having me conduct all further proceedings in this case.  ECF 30.

[3] Because the administrative record (filed as Exhibit 1 to the Motion) is a collection of various documents with their own respective page numbers, citations to the administrative record in this opinion use the page number noted in the filing header.

is **GRANTED**, and the Secretary's Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

### A. Cumbie joins the U.S. Air Force and is deployed to Iraq.

South Carolina native Thomas Cumbie joined the United States Air Force on April 13, 2004, after graduating college and serving as a police officer for approximately two years. ECF 38 ("Pl.'s MSJ") at 7; AR, at 15, 28, 51, 102, 115. For the next three years, he trained and served as an Operations and Geospatial Intelligence Analyst at Davis-Monthan Air Force Base in Arizona. AR, at 15, 102. In 2008, he became an Intelligence Surveillance Reconnaissance Operator ("ISRO") in support of Operation Iraqi Freedom and Operation New Dawn. Pl.'s MSJ, at 7; AR, at 15-16. As an ISRO, Cumbie completed three tours in Iraq: one in 2009, one in 2010, and another in 2011. ECF 33 ("Def.'s MSJ") at 6; Pl.'s MSJ, at 7; AR, at 16, 20, 84, 102, 190. Each tour lasted about two months; the first two being in Balad, and the third in Taji. *Ibid*. Cumbie characterized his first two tours as "uneventful," but a health assessment post-second deployment noted symptoms "consistent with" post-traumatic stress disorder ("PTSD") and recommended assessment and referral. AR, at 16, 190.

The events and circumstances of Cumbie's third and final deployment are central to his CRSC pursuit and this case. This final deployment began on July 19, 2011. *Id*. at 84. Cumbie claims that while in Taji, insurgents frequently attacked his unit. Pl.'s MSJ, at 8; AR, at 16, 20, 22, 27, 69, 84, 102. The attacks allegedly involved improvised explosive devices ("IEDs") and improvised rocket-assisted munitions ("IRAMs") and occurred "almost daily for several weeks . . . right after [the unit] got off [of work] in the morning . . . [and] tried to go to bed." *Ibid*. Cumbie alleges that, on several occasions, he witnessed injured unit members and demolished buildings as a result of the attacks.

Pl.'s MSJ, at 8; AR, at 22, 27.  Cumbie insists that during the attacks, he felt "threatened," "intense fear," and "helpless"; after the attacks, he felt "out of it [and] shocked for hours to days."  Pl.'s MSJ, at 8; AR, at 16, 22.  He also claims that because of the attacks, he experienced "nosebleeds and headaches . . . nightmares, [] anxiety[-]producing intrusive thoughts about [the attacks] . . . sleep disruptions and emotional problems [and] experience[ed] anxiety and panic attacks. "  Pl.'s MSJ, at 8-9; AR, at 16, 27.  Cumbie also explains that as an ISRO, he directed unit movements while under attack, and that this responsibility made him feel "horrified, terrified, and helpless."  Pl.'s MSJ, at 8; AR, at 27.  Overall, Cumbie felt "paranoid and [unsafe]."  AR at 84.  He felt "constantly in danger, on guard[,] and an overall sense of panic."  Pl.'s MSJ, at 9; AR, at 16.  While deployed, he neither sought medical treatment nor sustained any obvious physical injury.  AR, at 16, 21.

     *B. Cumbie returns to the United States and seeks mental health treatment.*

Cumbie returned to the United States in September 2011.  *Id.* at 232.  He was stationed at Pope Army Airfield in North Carolina.  Pl.'s MSJ, at 9; AR, at 103.  Cumbie claims that upon return, while at a post-deployment medical evaluation, he "was told to seek mental health treatment or [he] would be ordered to."  Pl.'s MSJ, at 9; AR, at 17.  Cumbie's mental health treatment began[4] in 2012 when he visited a psychiatrist "following an episode of substance-induced mania due to an adverse reaction to pain medication."  AR, at 191.  At his first meeting with the psychiatrist, Cumbie reported anxiety but denied any "traumatic events at all."  *Id.*  Later, during a May 2012

---

[4] After his third deployment, Cumbie also participated in three undocumented mental health sessions regarding re-integration stress.  It is unclear exactly when these occurred and whether the sessions were related to any PTSD symptoms.  AR at 191.

psychological test, he again reported anxiety but, this time, attributed its onset to the
events and circumstances of the third deployment. *Id.* He also opined that his anxiety
had no correlation to his experiences as a police officer. *Id.*

Though his medical records show that he began treatment for PTSD sometime
after returning to the United States in late 2011, Cumbie was not officially diagnosed
with PTSD until January 4, 2013.[5] AR, at 23. At the evaluation with Elise P. Vestal,
Ph.D., Cumbie attributed his mental health condition to the events and circumstances of
his third deployment. *Id.* at 20, 22. In reaching her diagnosis, Dr. Vestal explained:

> The following changes have occurred to claimant's psychosocial functional
> status and quality of life following the traumatic exposure: claimant
> reported being socially isolated and having more work conflict since
> returning from his [third] deployment. The effects of PTSD symptoms on
> claimant's employment and overall quality of life include occupational and
> social impairment. The pre-trauma risk factors that may have rendered
> claimant vulnerable to PTSD include: chronic pain and depression. . . .
> The best description of claimant's current psychiatric impairment is:
> psychiatric symptoms cause occupational and social impairment with
> occasional decrease in work efficiency and intermittent inability to
> perform occupational tasks although generally claimant is functioning
> satisfactorily with routine behavior, self-care and normal conversation.
> The above statement is supported by the following systems: depressed
> mood, anxiety, suspiciousness, panic attacks weekly or less often, chronic
> sleep impairment and mild memory loss such as forgetting names,
> directions or recent events. Currently, he has difficulty establishing and
> maintaining effective work/school and social relationships because of
> depression, irritability, etc. . . . Currently, he has occasional interference
> with recreation or leisurely pursuits because of depression and chronic
> pain. . . . Based upon the examination, claimant needs to seek follow up
> treatment. The claimant requires continued mental health treatment. . . .

---

[5] For example, on December 7, 2012, Captain Sarah E. Jackson, Ph.D., saw Cumbie for
pain and PTSD symptoms. *Id.* at 72. Dr. Jackson acknowledged Cumbie's "ongoing
treatment for combat-related PTSD" and attributed his pain "to degenerative disc
disorder/arthritis, [a] bulging disc, [and] pinched nerves." *Id.* In her notes, Dr. Jackson
provided a list of Cumbie's medications and referred him to a clinical psychology consult
for further diagnostics. *Id.*

*Id.* at 24.  Dr. Vestal noted that, to treat his PTSD and depression, Cumbie attended

psychotherapy once per week and consumed Zoloft, Wellbutrin, Desyrel, and Lunesta

daily.  *Id.* at 20-21.  Dr. Vestal also recognized that before his third deployment, Cumbie

had already been experiencing depression and sleep impairment because of the back

pain he developed during his first tour.  *Id.* at 20.

On February 25, 2013,[6] Cumbie received a second medical evaluation from Dr.

Jackson.  Pl.'s MSJ, at 9; *see* AR, at 26-33. *see also supra* n.6.  Dr. Jackson also

diagnosed Cumbie with PTSD, major depressive disorder, and chronic back pain.  AR, at

31-32.  Like at Dr. Vestal's evaluation, Cumbie attributed his mental health issues to the

events and circumstances of his third deployment.  *Id.* at 27, 29.  Dr. Jackson found that

Cumbie's PTSD was "evidenced by . . . recurrent, intrusive memories of his deployment

experiences" and "exposure to sentinel events in which he experienced multiple 'close

calls' while deployed and near death of unit members, and others in which he feared for

his life and experienced terror and horror."  *Id.* at 31.  Dr. Jackson further found that

Cumbie's depression was "evidenced by [a] . . . depressed mood most of the day, . . .

markedly diminished interest or pleasure in all, or almost all, activities . . ., insomnia

nearly every day, . . . fatigue or loss of energy nearly every day, [and] feelings of

worthlessness or excessive or inappropriate guilt[] nearly every day[.]"  *Id.* at 32.

---

[6] Following his formal PTSD diagnosis, on January 15, 2013, Cumbie reported to Dr.
Laura Hudson for a mental status examination. AR, at 75.  Dr. Hudson noted Cumbie's
psychologist's belief that his PTSD pre-dated his military service, dating back to being a
police officer, and "was exacerbated on [active duty] when his intel was used to guide
soldiers who were sometimes killed downrange."  *Id.* at 76.  Because of Cumbie's low
energy and insomnia, Dr. Hudson increased the dosages of previously prescribed
medications and issued two more prescriptions.  *Id.*  Dr. Hudson did not deem Cumbie
unqualified to continue active-duty service.

In reaching these conclusions, Dr. Jackson offered the following remarks:

While he has made slow improvements over the course of treatment, TSgt Cumbie is currently experiencing the complex effects of multiple conditions, and continues to demonstrate symptoms at a level and frequency that would be inconsistent with continued Active Duty service. Despite ongoing treatment, he continues to experience periods of marked distress, and significant relapses accompanied by severe degradations in functioning related to his psychological and physical symptoms. Additionally, [Cumbie] continues to experience periods of time in which significant decreases in occupational and social duties are necessary in order to maintain his psychological and physical stability. [Cumbie] continues to experience symptom intensity that impairs his ability to perform some tasks in his alternate duty assignment . . . and experiences challenges with maintaining optimal performance due to the demands of his ongoing medical and psychological care[.] He relies heavily on his spouse's support, regular contact with Mental Health services and family members to maintain his current level of performance. . . .

Based on the above evaluation he is not deemed World-Wide Qualified or Deployable from a mental health perspective. It is unlikely that TSgt Cumbie would ever be able to qualify for deployment again given the effects of both his medical and psychological conditions. It is also likely that he will require some ongoing accommodations for an extended period of time in order to maintain overall physical and mental health in a civilian capacity. . . . Even with appropriate treatment, complex PTSD particularly with co-morbid diagnosis[, like depression,] tends to be severe and sometimes chronic condition, and future decompensation is an ongoing risk even with treatment.

*Id.* at 33. Dr. Jackson noted her belief that "some of TSgt Cumbie's traumatic experiences occurred during the course of his work as a [p]olice [o]fficer prior to entering onto active duty"—experiences that, according to him, included "being fired upon multiple times, exposure to dead bodies, suicides, rapes, child abuse, and other issues." *Id.* at 29, 31. Cumbie denied any correlation between these experiences as a police officer and his mental health issues. *Id.* at 29. Dr. Jackson opined that Cumbie's mental health symptoms during his time as a police officer, "did not meet [the] criteria for" PTSD. *Id.* at 31.

On May 7, 2013, after consideration of Dr. Jackson's 2013 evaluation, a Medical Board Report from the Air Force diagnosed Cumbie with PTSD, major depression, pain disorder with psychological factors, and lumbago. *Id.* at 39. The report found that his PTSD originated on or about July 1, 2011, while his depression originated on or about September 1, 2011. Pl.'s MSJ, at 10; AR, at 39. The report also concluded that both conditions did not exist prior to service. *Ibid.* As a result of its findings, the medical board referred Cumbie to the Air Force Physical Evaluation Board ("PEB"). *Id.*

  C. *Cumbie leaves active duty and retires from the Air Force.*

On July 23, 2013, the Department of Veterans Affairs ("VA") proposed a disability rating of fifty percent based on PTSD with major depression "that develop[ed] in service as a result of a highly stressful event [] severe enough to bring about [his] release from active military service." Pl.'s MSJ, at 12; AR, at 44. On October 19, 2013, the PEB deemed Cumbie unfit for further military service due to PTSD, major depression and pain disorder, and lumbago intervertebral disc syndrome and recommended placement on the Temporary Disability Retired List ("TDRL") with a disability rating of sixty percent. Pl.'s MSJ, at 10; AR, at 131-32. The PEB determined Cumbie's PTSD to be combat related based on his reports that his unit was "under heavy attack almost daily for several weeks with 'multiple close calls and destruction of buildings and structures very near'" and that "his sleeping quarters rock[ed] violently with mortar attacks[.]" AR, at 132.

Apparently relying on the PEB finding, the Air Force relieved Cumbie from active duty on December 10, 2013, effective March 27, 2014. Pl.'s MSJ, at 11; AR, at 41. The Air Force determined that his PTSD was (i) "a direct result of armed conflict or caused by an instrumentality of war and incurred in line of duty during a period of war;" (ii)

"the direct result of a combat related injury as defined in 26 U.S.C. § 104;" and (iii) "incurred in a combat zone or incurred during the performance of duty in combat-related operations as designated by the Secretary of Defense." AR, at 41. On March 31, 2014, the Air Force placed Cumbie on the TDRL. Pl.'s MSJ, at 11; Def.'s MSJ, at 6; AR, at 79. In a rating decision dated April 9, 2014, the VA granted Cumbie service connection based on his PTSD with major depression "directly related to military service" and assigned a disability rating of fifty percent, effective March 28, 2014. Pl.'s MSJ, at 12; AR, at 51-52.

On November 4, 2015, the PEB found that Cumbie remained unfit for further military service and recommended permanent retirement with a disability rating of sixty percent. Pl.'s MSJ, at 11; AR, at 66-67. The PEB again determined his PTSD to be combat related as defined in 26 U.S.C. § 104. Pl.'s MSJ, at 11; AR, at 66. Cumbie permanently retired from the Air Force on March 22, 2016 with a disability rating of sixty percent. Def.'s MSJ, at 6; AR, at 110-11. Relying on the PEB finding, the Air Force again determined that his PTSD was (i) "a direct result of armed conflict or caused by an instrumentality of war and incurred in line of duty during a period of war;" and (ii) "the direct result of a combat-related injury as defined in 26 U.S.C. § 104." *Id.* at 112.

*D. Cumbie applies for and is denied Combat-Related Special Compensation.*

Based on his PTSD, Cumbie applied for CRSC, which the Air Force Physical Disability Division ("PDD") denied on June 9, 2014. Pl.'s MSJ, at 15; Def.'s MSJ, at 6; AR, at 69-70. Noting its review of the PEB finding, including Cumbie's reports that he was "under heavy attack almost daily for several weeks," the PDD found that Cumbie's "[d]ocumentation [did] not confirm [that he was] directly exposed to a combat-related event (hostile fire)." AR, at 69. The PDD noted that "[w]hen making combat-related

8

determinations for PTSD, the Board looks for instances of direct exposure to a specific combat-related event placing your life at risk, such as direct exposure to gunfire or mortar attack, or surviving an aircraft crash." *Id.* The PDD explained that the PEB finding does "not automatically qualify" a person's disability as combat-related because the "process and standards" for determining combat-related injuries under the CRSC program are different than those governing a person's ability to remain fit for further military service. *Id.* The standard for determining a combat-related injury under the CRSC program, according to the PDD, is "much more rigorous[,] . . . requires documentation to support a qualifying combat-related event or events as the direct cause of a disability[,]" and involves a closer look at "what caused the condition, the activities taking place at the time, and resulting disability." *Id.* at 69-70. The PDD then encouraged Cumbie to submit for reconsideration documentation "confirming exposure to hostile fire." *Id.* at 69.

Cumbie requested reconsideration, which the PDD denied on April 4, 2017. Pl.'s MSJ, at 16; Def.'s MSJ, at 6; AR, at 88-89. The PDD found that his reports of frequent, heavy mortar attacks and supporting documentation "contained no definitive evidence to confirm [that his PTSD] was the direct result of a combat-related event" and did "not confirm exposure to hostile fire." AR, at 88. The PDD reiterated the standards for making combat-related determinations for PTSD and again encouraged Cumbie to submit for reconsideration documentation "confirming exposure to hostile fire." *Id.*

### E. Cumbie unsuccessfully appeals the denial of his CRSC application.

On September 13, 2018, Cumbie filed an application for correction of military records with the Air Force Board for Correction of Military Records ("AFBCMR" or the "Board"), appealing the PDD's decision to deny his application for CRSC. Pl.'s MSJ, at

16; Def.'s MSJ, at 7; AR, at 12-13. Cumbie argued that he was entitled to CRSC because his PTSD, major depression, and pain disorder constituted combat-related injuries. AR, at 4. On March 3, 2024, the AFBCMR denied Cumbie's application (the "AFBCMR Decision"). It explained that:

> the Board concludes the applicant is not the victim of an error or injustice. The Board concurs with the rationale and recommendation of [the Air Force Personnel Center's Directorate of Airman and Family Care's Physical Disability Division ("AFPC/DPFDC")] and [the Office of the Assistant Secretary of Defense ("OASD")] and finds <u>a preponderance of the evidence does not substantiate the applicant's contentions</u>. . . . [T]he fact a member incurred the disability during a period of war; while serving in an area of armed conflicts; and/or while participating in combat operations is not sufficient by itself to support a combat-related determination for [an] award of CRSC. When making combat-related determinations, with regard to Armed Conflict, Hazardous Service, Simulation of War or an Instrumentality of War, the Board looks for definite, documented, causal relationship between the armed conflict and the resulting disability. The [Department of Veterans Affairs] awards service-connected disabilities based on their standard and they resolve doubt in the interest of the veteran and grant service connection for injuries or diseases incurred while in service. Furthermore, a combat-related determination by the PEB does not automatically qualify an applicant for CRSC. While service connection for disabilities is required for initial eligibility for CRSC consideration, the CRSC program is designed to provide compensation for combat-related injuries and its standard are much more rigorous when determining if claimed disabilities qualify as combat-related. There needs to be evidence that confirms both the injuries and how they occurred (combat-related event) to confirm the disabilities were a direct result of Armed conflict, Hazardous Service, Simulation of War or an Instrumentality of War. <u>The applicant has not shown he was actively engaged with enemy forces; therefore, does not meet the criteria for disabilities incurred as a direct result of armed conflict for CRSC purposes.</u> [sic]

AR, at 10 (emphasis added). In reaching its conclusion, the AFBCMR reviewed Cumbie's medical records and testimony and considered two advisory opinions and Cumbie's responses thereto. *See id.* at 4-10.

The AFPC/DPFDC issued the first advisory opinion on February 7, 2020, recommending that the AFBCMR deny Cumbie's application. Pl.'s MSJ, at 16; AR, at

182-83.  In its advisory opinion, the AFPC/DPFDC identified the following as pertinent

facts:

> Sergeant Cumbie submitted claims for CRSC compensation . . . for PTSD
> only.  Both of his claims were disapproved . . . as non-combat
> related/insufficient documentation.  Sergeant Cumbie contends that his
> disability was caused by coming under heavy attack almost daily for
> several weeks while deployed to Iraq.  Documentation provided by
> Sergeant Cumbie does not confirm his disabilities were a direct result of
> Armed conflict, Hazardous Service, Simulation of War or an Instrument of
> War. . . .
>
> The fact that a member incurred the disability during a period of war;
> while serving in an area of armed conflict; and/or while participating in
> combat operations is not sufficient by itself to support a combat-related
> determination . . . .  When making combat-related determinations, with
> regard to Armed conflict, Hazardous Service, Simulation of War or an
> Instrument of War, the Board looks for definite, documented, causal
> relationship between the armed conflict and the resulting disability.
>
> The information Sergeant Cumbie provided in [his application] provided
> no new evidence that supports his claim for CRSC compensation for PTSD
> . . .; such as decoration citations, performance reports, confirming *direct*
> exposure and in-service medical records from the time of the injuries that
> confirms both the injuries and how they occurred (combat-related event).
>
> Additionally, the [PEB] found Sergeant Cumbie's PTSD to be combat-
> related or occurred in the combat zone . . . .  [The PEB's] process and
> standards are governed under a guidance which determines a member's
> ability to remain fit for active duty.  However, the PEB's decision does not
> automatically qualify his disability as combat-related under the CRSC
> program.  The CRSC program is designed to provide compensation for
> combat-related injuries.  Consequently, our standards are much more
> rigorous when determining disabilities under current criteria.
>
> The Department of Veterans Affairs (VA) awards service connected
> disabilities based on their standards.  They resolve doubt in the interest of
> the veteran and grant service connection for injuries or diseases incurred
> while in service.  While service connection for disabilities is required for
> initial eligibility for CRSC consideration, the CRSC program is designed to
> provide compensation for combat-related injuries and its standards are
> much more rigorous when determining if claimed disabilities qualify as
> combat related.

AR, at 182-83 (emphasis in original).  In his response, Cumbie argued that the

AFPC/DPFDC applied the incorrect legal standard in determining whether his PTSD

was combat related, impermissibly used the absence of evidence as evidence that the

mortar attacks did not occur, failed to obtain an advisory opinion from the OASD first,

and reached the incorrect result based on the available evidence. *Id*. at 185-87.

The OASD issued the second advisory opinion on September 5, 2023, also

recommending that the AFBCMR deny Cumbie's application. Pl.'s MSJ, at 17; AR, at

188-93. In its advisory opinion, the OASD stated:

> TSgt Cumbie has not provided sufficient evidence tying his PTSD to a
> specific combat related scenario. <u>In order to qualify as a disability
> incurred as a direct result of armed conflict, applicants must show that
> they were 'engaged with a hostile or belligerent nation, faction, force, or
> with terrorists.' TSgt Cumbie has not shown that he was actively engaged
> with enemy forces, and as a result does not meet the criteria for disabilities
> incurred as a direct result of armed conflict.</u> Similarly, there is insufficient
> evidence tying his PTSD to any direct interaction with an instrumentality
> of war. The Service CRSC Board, which has considerable experience in
> assessing combat-relatedness claims in many contexts, determined that
> TSgt Cumbie has not satisfied the burden of proof to show combat-
> relatedness in this case. I find nothing that warrants a different result.
>
> Based on the applicable provisions of law, regulation, and policy governing
> entitlement to, and administration of, CRSC, it is my opinion that TSgt
> Cumbie's service-connected VA-compensable PTSD does not meet the
> qualifying criteria required to establish that it is combat-related for
> purposes of entitlement to CRSC as incurred as a direct result of armed
> conflict or via an instrumentality of war. TSgt Cumbie thus does not
> qualify for payment of CRSC for his PTSD and his petition to the AFBCMR
> should be [denied].

AR, at 192-93 (emphasis added). Cumbie responded on September 15, 2023, arguing

that the OASD applied the incorrect legal standard in determining whether his PTSD

was combat related and reached the incorrect result based on the available evidence. *Id*.

at 195-98.

F. *Cumbie seeks judicial review of the CRSC denial.*

Having exhausted all administrative remedies, Cumbie filed this lawsuit on August 28, 2024.[7]  ECF 1; Pl.'s MSJ, at 18.  His complaint asserts a claim under the Administrative Procedure Act ("APA"), seeking remand of the AFBCMR Decision and an award of attorneys' fees and court costs.  Amend. Compl., at 15.  Cumbie alleges three errors in the decision:  that the AFBCMR erroneously relied on an improper advisory opinion, applied the incorrect legal standards, and failed to base its decision on substantial evidence.  *Id*. at ¶ 50-64.  Defendant filed its Motion for Summary Judgment, which included the administrative record, on January 17, 2025.  ECF 33.  Cumbie responded with his own Cross-Motion for Summary Judgment on March 14, 2025.  ECF 38.  Each party filed responses.  ECFs 39-40.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[8] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); s*ee* Fed. R. Civ. P. 56(c); *see also*

---

[7] Cumbie amended his complaint on October 2, 2024.  Pl.'s MSJ, at 18; *see* Amend. Compl., ECF 20.

[8] When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to the factfinder for resolution at trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."  *Id*.  In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013); *see Scott v. Harris*, 550 U.S. 372, 378 (2007).

*Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). However, the Rule 56(a) standard has no place in cases "involving review of a final agency action under the APA . . . because of the limited role of a court in reviewing the administrative record." *Ctr. for Sci. in the Pub. Interest v. Perdue*, 438 F. Supp. 3d 546, 556 (D. Md. 2020); *see also Hoffler v. Mattis*, 677 Fed. App'x 119, 120 (4th Cir. 2017) ("Decisions of the AFBCMR are final agency actions subject to judicial review under the [APA]."). Instead, courts look at whether the AFBCMR's decision "is supported by the administrative record and is otherwise consistent with the APA standard of review." *Perdue*, 438 F. Supp. 3d at 557. Under this standard, "[t]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (internal quotation marks and citations omitted). Judicial review of an AFBCMR decision "is generally restricted to the administrative record." *Garcia v. Kendall*, No. 23-cv-3188-TJS, 2024 WL 5107231, at *7 (D. Md. Dec. 12, 2024).

An AFBCMR decision "can only be set aside . . . if [it is] arbitrary, capricious, not based on substantial evidence, or not in accordance with law." *Mattis*, 677 Fed. App'x at 120. A decision is arbitrary or capricious if the AFBCMR "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [AFBCMR], or is so implausible that it could not be ascribed to a difference in view or the product of [AFBCMR] expertise." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (internal quotation marks and citation omitted); *see also Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)

(noting that "the court must consider whether the [AFBCMR] considered the relevant factors and whether a clear error of judgment was made"). Similarly, a decision is not arbitrary or capricious if it "includes 'a rational connection between the facts found and the choice made.'" *Ohio Valley*, 556 F.3d at 192 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted)). A decision is based on substantial evidence if "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Hoffler v. Hagel*, 122 F. Supp. 3d 438, 447 (E.D.N.C. 2015) (internal quotation marks and citation omitted).

Judicial review of an AFBCMR decision under the APA requires "significant judicial deference."[9] *Dorado-Ocasio v. Averill*, 128 F.4th 513, 521 (4th Cir. 2025). In

---

[9] This Court and others in this circuit have applied such deference when reviewing AFBCMR decisions. *See Garcia*, 2024 WL 5107231, at *7-8 (reviewing an AFBCMR decision with significant judicial deference); *Williams*, 2022 WL 4134316, at *6-7 (same); *see also Roetenberg v. Sec'y of Air Force*, 73 F. Supp. 2d 631, 636 (E.D. Va. 1999) ("[C]ourts should accord great deference to a[n] AFBCMR decision."); *Hagel*, 122 F. Supp. 3d at 446-47 (reviewing an AFBCMR decision with significant judicial deference). In this circuit, it is well recognized that challenges to AFBCMR decisions "are considered under an 'unusually deferential application'" of the APA standard of review. *Harrison v. Kendall*, 670 F. Supp. 3d 280, 299 (E.D. Va. 2023) (quoting *Downey v. U.S. Dep't of the Army*, 110 F. Supp. 3d 676, 686-87 (E.D. Va. 2015) (internal quotation marks and citation omitted)). Earlier this year, the Fourth Circuit explained that this unusual deference "is rooted in (1) the statutory language giving life to the [Army Board for Correction of Military Records], (2) the judiciary's longstanding commitment and obligation to avoid unnecessary intrusion into the military chain of command, and (3) the most basic principles of judicial economy." *Dorado-Ocasio*, 128 F.4th at 520. Expounding on these reasons, the court quoted with approval the D.C. Circuit's explanation that such limits are necessary to avoid a level of judicial involvement "'that would destabilize military command and take the judiciary far afield of its area of competence.'" *Id.* (quoting *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000)).

As Cumbie identifies, recent D.C. Circuit authority explains that the "unusually deferential" standard attaches to cases involving active personnel management—e.g., hiring, promotion, and discipline—but not to matters of post-retirement disability determinations, which are subject to the ordinary arbitrary-and-capricious standard. *See Sissel v. Wormuth*, 77 F.4th 941, 946-47 (D.C. Cir. 2023) (reviewing a Physical

other words, "the standard of review is 'a narrow one[,]' and it must 'presume[] the validity of'" the AFBCMR's decision. *Williams v. Roth*, No. 21-cv-2135-PX, 2022 WL 4134316, at *6 (D. Md. Sept. 12, 2022) (first citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989); and then citing *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 16 F.3d 1395, 1400 (4th Cir. 1993)). Courts must remain "highly deferential" to these decisions "with a presumption in favor of finding the [decision] valid[,]" *Ohio Valley*, 556 F.3d at 192, and are "not permitted to reweigh evidence, make credibility determinations, or substitute its judgment for that of the [AFBCMR,]" *Williams*, 2022 WL 4134316, at *6. Although the APA standard of review "is not meant to reduce judicial review to a 'rubber-stamp' of agency action[,] . . . the court must nonetheless engage in a 'searching and careful' inquiry of the record." *Ohio Valley*, 556 F.3d at 192 (first citing *Ethyl Corp. v. Env'tl Prot. Agency*, 541 F.2d 1, 34 (D.C. Cir. 1976); and then citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## III.    ANALYSIS

Cumbie argues that the AFBCMR Decision is arbitrary, capricious, and not based on substantial evidence. He attacks the decision as arbitrary and capricious because the AFBCMR failed to rationally connect the evidence to its conclusions, adequately review

---

Disability Board of Review determination of an Army servicemember; "[T]he cases in which we have emphasized the need for a heightened standard of review to safeguard military judgment have involved decisions concerning active personnel, such as performance reviews and promotion decisions. . . . Reviewing [disability ratings decisions] under ordinary arbitrary-and-capricious review would not 'destabilize military command.'" (citations omitted)). The Court is bound by the Fourth Circuit's directives and is unaware of authority in this circuit drawing the distinction made in *Sissel*. Nonetheless, the potential differences in approach are irrelevant here because the Court finds error under even the "unusually deferential" standard (and thus would reach the same conclusion under the "ordinary arbitrary-and-capricious" standard).

conflicting evidence in the PEB and VA findings, apply the correct standard of review, weigh the relevant factors in determining that Cumbie's PTSD was not combat related, and consider the United States Department of Defense's ("DoD's") preference for consistency and uniformity of decision under the CRSC program.[10]  Pl.'s MSJ, at 22-31.

He further claims that the decision is not based on substantial evidence because the administrative record clearly demonstrates that Cumbie's PTSD was combat related, and the AFBCMR failed to adequately consider evidence conflicting with that conclusion.  *Id.* at 31-36.  Cumbie takes issue with the AFBCMR's reliance on the second advisory opinion, arguing that the opinion failed to apply the correct legal standards governing the AFBCMR and adequately consider conflicting evidence.  *Id.* at 28-29, 31, 34-36.

The Secretary posits that the decision is not arbitrary and capricious because the AFBCMR relied on an advisory opinion and considered the relevant factors in making a combat-related determination.  Def.'s MSJ, at 9-10.  The Secretary further contends that the decision is based on substantial evidence because the AFBCMR explained why the AFBCMR Decision differed from previous findings and relied on an advisory opinion that considered the relevant factors in making a combat-related determination.  *Id.* at

---

[10] Cumbie claims that by finding, in essence, that "a veteran must have been hit by mortars and rockets in order to obtain CRSC benefits," the AFBCMR ignored "binding guidance and statutory language that seeks to ensure uniformity."  Pl.'s MSJ, at 29-30. To support his claim, Cumbie presents Navy and Army BCMR decisions granting CRSC and finding PTSD combat related where an instrumentality of war was used in close proximity to the applicant and directly responsible for the applicant's PTSD—something he says happened to him.  *Id.* (citing AR, at 219-222, 234-58).  Finding remand warranted on other grounds, the Court declines to consider the merits of this argument.

10-12.  Because it agrees with many—but not all—of Cumbie's contentions,[11] the Court grants his motion and denies the Secretary's.

The AFBCMR Decision is arbitrary and capricious, and thus does not survive APA review for several reasons.  First, the AFBCMR applied the incorrect legal standard in determining whether Cumbie's PTSD was a disability incurred as a "direct result of armed conflict" and failed to rationally connect the evidence to its conclusion that Cumbie's PTSD was not combat-related.  Second, the decision does not sufficiently connect the evidence to its conclusion.  Third, based on those first two errors, the decision fails to clear the substantial evidence bar.

   A. *The AFBCMR applied the incorrect legal standard in determining whether Cumbie's PTSD was a disability incurred as a "direct result of armed conflict."*

To prove that his PTSD was combat related, the AFBCMR required Cumbie to show that he was *actively engaged with enemy forces*.  The AFBCMR both expressly denied Cumbie's CRSC application on this basis *and* adopted advisory opinions recommending denial on such basis.  *See* AR, at 10.  These are errors requiring remand. In making a combat-related determination under the CRSC program, no congressional statement evinces an intent that the AFBCMR require CRSC applicants to show that they were *actively engaged with enemy forces*.

When reviewing an agency interpretation of a statute, courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory

---

[11] Considering the limited standard of review and deference to the factfinder in several aspects of factfinding, the Court takes no position on whether the record clearly demonstrates Cumbie's entitlement to CRSC.  As explained below, errors in applying the proper standards and failure to address certain evidence—not a conclusion on the ultimate issue—drives the result here.

authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).[12]  That is, courts have a responsibility "'to decide whether the law means what the agency says.'"  *Id.* at 392 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring)).  This requires courts to "independently interpret the statute and effectuate the will of Congress . . . by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries."  *Id.* at 395 (citations omitted). "And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it."  *Id.* at 413.

To determine whether an agency has acted within its statutory authority, courts must "do their ordinary job of interpreting statutes . . . based on the traditional tools of statutory construction[.]"  *Id.* at 403.  The analysis "begins . . . with the text of the statute, giving the words their ordinary plain meaning in view of the text's context and statute's structure."  *Zalmai v. Josephs-Conway*, No. 24-497, 2025 WL 938619, at *3 (E.D. Va. Mar. 27, 2025) (citing *Dwoskin v. Bank of Am., N.A.*, 888 F.3d 117, 119 (4th Cir. 2018)).  If the text of the statute is clear and unambiguous, the court may end its

---

[12] Until 2024, the *Chevron* doctrine governed judicial review of agency interpretations of statutes.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  The Supreme Court overruled *Chevron* in *Loper Bright*.  603 U.S. at 377. "Since *Loper Bright* dealt specifically with ambiguities in statutory directives to agencies," *United States v. Boler*, 115 F.4th 316, 322 n.4 (4th Cir. 2024), the Court must review the AFBCMR's interpretation of 10 U.S.C. § 1413a under the *Loper Bright* framework.  *See Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d 882, 895 (E.D. Va. 2025) (observing that *Loper Bright* "only affects agency actions that stem from statutory ambiguity or silence"); *see, e.g.*, *Bussey v. Driscoll*, 131 F.4th 756, 761-64 (9th Cir. 2025) (reviewing an agency interpretation of a statute under the *Loper Bright* framework).

inquiry there. *Zalmai*, 2025 WL 938619, at *3; *Johnson & Johnson Health Care Sys.*
*Inc. v. Kennedy, Jr., Sec. of Health & Human Servs.*, No. 24-3188-RC, 2025 WL
1783901, at *9 (D.D.C. June 27, 2025). If the text is ambiguous, although they must
respect constitutional delegations, "courts need not and . . . may not defer to an agency
interpretation of the law simply *because* a statute is ambiguous." *Loper Bright*, 603
U.S. at 413 (emphasis added). Instead, "courts use every tool at their disposal to
determine the best reading of the statute and resolve the ambiguity." *Id.* at 400.

With this interpretive framework in mind, the Court begins its analysis with the
text of 10 U.S.C. § 1413a, which was first enacted in 2002. *See* Pub. L. 107-314. In
relevant part, Section 1413a provides:

> (a) The Secretary concerned shall pay to each combat-related disabled
> uniformed services retiree who elects benefits under this section a monthly
> amount for the combat-related disability of the retiree determined under
> subsection (b). . . .

> (c) For purposes of this section, an eligible combat-related disabled
> uniformed services retiree referred to in subsection (a) is a member of the
> uniformed services who (1) is entitled to retired pay . . . and (2) has a
> combat-related disability.

> (d) The Secretary of Defense shall prescribe procedures and criteria under
> which a disabled uniformed services retiree may apply to the Secretary of a
> military department to be considered to be an eligible combat-related
> disabled uniformed services retiree. Such procedures shall apply uniformly
> throughout the [DoD].

> (e) In this section, the term "combat-related disability" means a disability
> that is compensable under the laws administered by the Secretary of
> Veterans Affairs and that (1) is attributable to an injury for which the
> member was awarded the Purple Heart or (2) was incurred (as determined
> under criteria prescribed by the Secretary of Defense) (A) as a *direct result
> of armed conflict*; (B) while engaged in hazardous service; (C) in the
> performance of duty under conditions simulating war; or (D) through an
> instrumentality of war. . . .

10 U.S.C. §§ 1413a(a), (c)-(e) (emphasis added).[13]

Assigning the words their ordinary, plain meaning, it is implausible to interpret the phrase "direct result of armed conflict" as necessarily requiring evidence of *active engagement with enemy forces* to establish a combat-related disability.  No doubt, evidence of active engagement with enemy forces—as one might understand such a phrase—may be sufficient to establish a disability incurred as a "direct result of armed conflict."  But nothing in the statute deems it necessary.  Indeed, the scope of this type of combat-related disability appears much broader than the Secretary suggests.  Combining each plain meaning definition, disabilities incurred as a "direct result of armed conflict" include disabilities incurred as an "immediate consequence" (i.e., direct result) of a "political conflict in which both sides are armed with weapons" (i.e., armed conflict).  *See Armed conflict*, Oxford English Dictionary (2d ed. 1989) (originally published as part of the entry for *armed, adj.*); *Direct*, Black's Law Dictionary (7th ed. 1999) (providing "direct injury" as an example of the definition "[f]ree from extraneous influence; immediate"); *Result*, Oxford English Dictionary (2d ed. 1989) ("The effect, consequence, issue, or outcome of some action, process, design, etc."); *see also Pharmaceutical Coalition for Patient Access v. United States*, 126 F.4th 947, 954, 958-62 (4th Cir. 2025) (considering dictionary definitions, including from Black's Law Dictionary, when ascertaining the relevant terms' "ordinary meaning" and rejecting an argument that the court apply a term's "specialized criminal law meaning"); *Cruz v.*

---

[13] The statute does not define the four types of non-Purple-Heart combat-related disabilities.  Instead, the DoD released guidance in early 2024 assigning definitions to each type.  *See* AR, at 214-15.

*Garland*, 101 F.4th 361, 365 (4th Cir. 2024) (examining definitions in "[d]ictionaries in circulation at the time of enactment," including the Oxford English Dictionary).

This construction does not foreclose a combat-related disability incurred as an "immediate consequence" of a "state of open hostility" that does not involve *active engagement* with enemy forces. The Secretary does not identify a congressional directive requiring or otherwise supporting this restrictive modification of the plain meaning of those terms as reflected in contemporaneous dictionaries.[14] As a result, the AFBCMR acted outside of its authority when it required Cumbie to show that he was *actively engaged with enemy forces*. A plain reading of the statute warrants such conclusion.

Even if ambiguous, this Court's "best reading of the statute" still renders the AFBCMR Decision erroneous. *Loper Bright*, 603 U.S. at 400. The government seems to think so too. It so much as admitted it in *Caliste v. United States*, when it asked for (and received) remand from the U.S. Court of Federal Claims in a case where the Board for Correction of Naval Records ("BCNR") denied a servicemember's CRSC application. No. 22-cv-00407-RTH, 2023 WL 179633, at *1 (Fed. Cl. Aug. 3, 2022). Similar to Cumbie, the plaintiff in *Caliste* sought CRSC for PTSD that she allegedly incurred while deployed in Afghanistan. *Id.* Like the AFBCMR, despite credible evidence of exposure to IEDs and rockets, the BCNR based its denial on her failure to show that that she was "actively engaged in combat with the enemy when incurring [her] disability." *Id.* at *2.

---

[14] Of course, "[t]ext may not be divorced from context." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 356 (2013). As a result, "the same words, placed in different contexts, sometimes mean different things." *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality op.). But nothing in this record persuades the Court why this context requires a more restrictive construction than those words might ordinarily receive.

The government thought remand appropriate because it was unsure whether the BCNR applied the proper standard for determining a combat-related disability under the CRSC.  *Id.*  The government was concerned that because it considered "personal engagement with the enemy" as dispositive, the BCNR failed to make the necessary determination for establishing a combat-related disability: "whether there [was] a definite causal relationship between an armed conflict and [the plaintiff's] PTSD."  *Id.* at 4-5.  On remand, the BCNR granted the plaintiff's CRSC application, noting that a causal relationship existed "between the armed conflict in Afghanistan and [the plaintiff]'s PTSD," and that nothing in the CRSC program criteria requires a servicemember to show that they were "actively engaged in combat with the enemy" to establish a disability incurred as a "direct result of armed conflict."  *Caliste*, No. 22-cv-00407-RTH (Fed. Cl. May 19, 2023), ECF 16, at 5-6.

The Court, here, considers the government's actions in *Caliste* as further undermining the Secretary's attempt to construe the same language, in the same statute, as requiring the restrictive interpretation he urges.  *Cf. Loper Bright*, 603 U.S. at 403 (permitting courts to accord "due respect for the views of the Executive Branch"); *Johnson & Johnson*, 2025 WL 1783901, at *10 ("'the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is'") (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)).  *Caliste* took place three years ago.  However, nothing in the record suggests that any developments in the interim foreclose the interpretation considered in *Caliste*.  The government may shift its preferred interpretation and application of ambiguous language since the time of a statute's enactment.  However, the ability to shift—in the absence of a binding authority or some other sign that only one interpretation is valid—

23

undercuts (1) any argument that the language clearly requires the result the government

seeks here and (2) any argument inconsistent with the ordinary meanings reflected by

other interpretive aids.

A plain reading of the DoD's CRSC program guidance further supports the

Court's conclusion.[15]  Pursuant to its statutory authority, *see* 10 U.S.C. § 1413a(e)(2), the

DoD defines a disability incurred as a "direct result of armed conflict" as:

> a disease or injury incurred in the line of duty as a direct result of armed
> conflict. The fact that a member incurred the disability during a period of
> war or an area of armed conflict or while participating in combat
> operations is not sufficient to support a combat-related determination.
> There must be a definite causal relationship between the armed conflict
> and the resulting disability.
>
> Armed conflict includes a war, expedition, occupation of an area or
> territory, battle, skirmish, raid, invasion, rebellion, insurrection, guerilla
> action, riot, or any other action in which Service members are engaged
> with a hostile or belligerent nation, faction, force, or terrorists.
>
> Armed conflict may also include such situations as incidents involving a
> member while interned as a prisoner of war or while detained against his
> or her will in custody of a hostile or belligerent force or while escaping or
> attempting to escape from such confinement, prisoner of war, or detained
> status.

AR, at 214.[16]  Nowhere in the program guidance is there an express requirement that a

CRSC applicant show *active engagement with enemy forces*.  The definition appears

intended to prevent servicemembers from receiving CRSC for disabilities incurred

incidental to "a period of war or an area of armed conflict;" it focuses on "disease or

---

[15] The DoD's CRSC program guidance discusses, among other things, definitions and
considerations relevant to the four types of combat-related disabilities under 10 U.S.C.
§ 1413a(e)(2).  *See* AR, at 200-215.

[16] The DoD further proscribes that "[w]ith respect to VA awards of service-connection
for . . . [PTSD]," the AFBCMR "must independently determine the relationship between
[the PTSD] and the qualifying criteria."  *Id.* at 205.

injury incurred in the line of duty."  Nonetheless, requiring a showing of *active engagement with enemy forces* is still at odds with the universe of disabilities it appears the DoD intends to capture.[17]  Sure, evidence of *active engagement with enemy forces* may be sufficient to establish "a disease or injury incurred in the line of duty," but nothing in the statute or any other source identified by the Secretary compels it.  One can, and the DoD did, think of a scenario where a servicemember is considered "in the line of duty" where they are not in *active engagement with enemy forces*—e.g., "such situations as incidents involving a member while interned as a prisoner of war or while detained . . . or while escaping or attempting to escape from such [statuses]." AR at 214; *see supra* at 24.  Holding otherwise would allow the Secretary to act outside of his delegated authority.  If he wishes to apply this concept of active engagement, he should take the matter up with Congress, not the courts.  *See Loper Bright*, 603 U.S. at 403 ("[T]o the extent that Congress and the Executive Branch may disagree with how the courts have performed [their ordinary job of interpreting statutes] in a particular case,

_____

[17] Further underscoring the Court's conclusion is the absence of any reconciliation of the second paragraph with the Secretary's proposed definition and alterations.  He does not explain what *actively engaged* means or—more importantly—how, if that is the standard, that language accounts for internment or escape, two scenarios that the Department of Defense believes falls within the scope of "armed conflict."  Must one be in an ongoing exchange of physical blows, gunfire, or other combat-related projectiles?  That seems to be the implication of this *actively engaged* language as applied to Cumbie's situation.  But such a definition would conflict with the language about internment, which does not necessarily involve such an exchange.  Instead, one could surmise that the reason the DoD includes internment within the statute is because internment is the direct consequence of open hostility between forces.  But that rationale would appear to extend to Cumbie's situation and conflict with the AFBCMR's treatment of his application.  These internal inconsistencies and lack of reconciliation further requires the Court to reject the Secretary's position.  *Cf. United States v. Maroquin-Bran*, 587 F.3d 214, 217 (4th Cir. 2009) (rejecting the government's interpretation because it would "yield an absurd and unjust result").

they are of course always free to act by revising the statute."); *see also King v. United States*, 149 Fed. Cl. 272, 276 (Fed. Cl. 2020) ("[A]dministrative review cases are not meant to serve as vehicles for challenging an agency policy itself.").

If that is not enough, a review of the statute's legislative history supports the same conclusion. *Cf. Johnson & Johnson*, 2025 WL 1783901, at *9-10 (reviewing legislative history to interpret the meaning of a statute); *Martin v. United States*, 133 Fed. Cl. 248, 256 (Fed. Cl. 2017) (same)[18]. The Court does not find any indicia of clear congressional intent requiring a showing of *active engagement with enemy forces* to establish a disability incurred as a "direct result of armed conflict." On the contrary, legislative materials suggest that Congress intended for courts to broadly interpret this definition. For example, during a debate leading up to the statute's enactment, Senator McCain stated that the definition of "direct result of armed conflict" accounted for

---

[18] The U.S. Court of Federal Claims in *Martin* reviewed the DoD's interpretation of "hazardous service" under 10 U.S.C. § 1413a(e)(2)(B). 133 Fed. Cl. at 253. Because the opinion issued in 2017 however, the court applied the now-overruled *Chevron* doctrine. *Id.* at 254. Such application proved dispositive, as the court deferred to the DoD's interpretation after concluding that the statute was ambiguous. *Id.* at 257-58. The Court here is no longer constrained by *Chevron* in the manner applicable in *Martin*. *See id.* at 258 ("Whether the Court believes that such a definition for 'hazardous service' is the best possible definition is irrelevant to the instant matter—the duty of the Court is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." (internal quotation marks and citation omitted)).

Regardless of the differing applicable standards, the Court may still employ similar construction tools in interpreting "direct result of armed conflict" as the *Martin* court did in interpreting "hazardous service." *Cf. Zalmai*, 2025 WL 938619, at *10 (relying on cases determined while *Chevron* was binding). After all, the phrases are contained in the same subsection of the statute and are two of the four combat-related disability types. *Cf. Doe v. Cooper*, 842 F.3d 833, 844 (4th Cir. 2016) (observing that under "the principle of *in pari materia*[,] . . . adjacent statutory subsections that refer to the same subject matter should be read harmoniously" (internal quotation marks and citation omitted)).

servicemembers with combat-related PTSD, and that the CRSC program "is for physical or mental pain or suffering that occurs during and as a result of military service." 148 Cong. Rec. S10,869 (2002). In another debate, Representative Hunter said that the combat-related disabilities under 10 U.S.C. § 1413a(e)(2) do not require a showing of "enemy fire" but rather involvement "in some type of a role that relates to combat." 148 Cong. Rec. H8,535 (2002). He further expressed that injuries sustained while "in a combat zone undertaking military operations" may qualify as combat-related disabilities. *Id.* Even if the legislative history is ambiguous as to the precise scope of combat-related disabilities, one cannot reasonably view these materials as reflecting congressional intent that *active engagement with enemy forces* is a prerequisite for CRSC recipients. The Court has little trouble concluding that the Secretary's restrictive interpretation was not Congress' intent.

Although the Court would be comfortable granting Cumbie's Cross-Motion on this ground alone, other errors warrant remand of the AFBCMR Decision.

B. *The AFBCMR failed to rationally connect the evidence to its conclusion that Cumbie's PTSD was not combat-related.*

As the "administrative body of last resort" "for private bills to correct individual injustices" to servicemembers, *Sherengos v. Seamans*, 449 F.2d 333, 334 (4th Cir. 1971), the AFBCMR owes servicemembers a decision that is, at the very least, rational, *see Sierra Club*, 899 F.3d at 293 (explaining that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." (internal quotation marks and citations omitted)).  The AFBCMR failed to provide Cumbie a rational decision.

For starters, the AFBCMR "utterly failed to integrate any facts into its conclusory determination.  Nor did it explain at all how any facts supported its final decision." *Williams*, 2022 WL 4134316, at *7.  Instead, it adopted the recommendations of the advisory opinions, recited the combat-related disability definitions in the CRSC program guidance, and noted the lack of evidence of active engagement with enemy forces.  *See* AR, at 10.  Despite credible evidence that Cumbie's PTSD was combat-related, the AFBCMR did "not grapple with this evidence at all."  *Williams*, 2022 WL 4134316 at *7.  Such evidence includes testimony, medical records, and VA and PEB findings deeming Cumbie's PTSD combat-related.[19]  *Cf. Garcia*, 2024 WL 5107231, at *9 (finding arbitrary and capricious the AFBCMR's failure "to consider the authorities cited by" a servicemember).  The Secretary insists that the AFBCMR's reliance on advisory

---

[19] In an effort to present Cumbie's evidence as not credible, the Secretary materially mischaracterizes the medical records and testimony.  Most troubling is the assertion that Cumbie contradicted himself when describing the attacks in Taji.  According to the Secretary, Cumbie "told Dr. Vestal that his base was mortared '5 [times] in 2 months.'  However, he told Dr. Jackson that he was mortared 'daily' during the deployment."  Def's Response in Opp'n and Reply in Supp. of MSJ at 2, ECF 39.  But the information in Dr. Vestal's report is that "their base was mortared 5x in 2 months."  AR, at 20.  And the information in Dr. Jackson's report is that "his unit came under heavy attack almost daily for several weeks (IED's being walked up to small encampment entrance, constant barrage of mortar attacks, multiple direct hits, destruction of buildings and structures very near and around the SM, and multiple close calls)."  AR, at 27.  As Cumbie notes in his reply brief, the substitution of "mortared" in the second instance appears to create a conflict, either explicit or implied, where none actually exists.  Pl.'s Reply Mem. in Supp. MSJ at 9, ECF 40.  While it does not act as a factfinder, the Court does not agree with the Secretary's contention that there is a conflict in Cumbie's evidence to a degree that renders it incredible and eliminates the AFBCMR's need to address it.  It is telling that the government attempts to rewrite the record before the AFMCBR rather than wrestle with the structural flaws in the challenged decision.

opinions—which did grapple with Cumbie's evidence—is enough to render the decision rational. But the Secretary does not identify cases or statutes permitting military boards to treat advisory opinions as dispositive without having to weigh conflicting evidence or reconcile any errors in those opinions. Nor is the Court aware of any such authority. Rather, the AFBCMR must consider credible evidence *and* weigh the advisory opinions against the evidence—especially where, as here, a servicemember advances evidence in direct conflict with the AFBCMR's (and the advisory opinion's) conclusion. *Jeanpierre v. United States*, 176 Fed. Cl. 11, 32 (Fed. Cl. 2025); *LaBonte v. United States*, No. 18-1784-C, 2023 WL 3197825, at *9 (Fed. Cl. May 2, 2023); *cf. Harrison*, 670 F. Supp. 3d at 304 (finding arbitrary and capricious the AFBCMR's reliance on an advisory opinion without "independent evaluation of [the servicemember]'s application"). Even if an advisory opinion could be dispositive, any dispositive weight is seriously undermined where, as here, the advisory opinion relies on opinions applying an erroneous standard—that is, requiring Cumbie to show *active engagement with enemy forces*.

The AFBCMR Decision also "provides no basis for this Court to conclude [that] the [AFBCMR] ever addressed" Cumbie's argument for his PTSD to be deemed a disability incurred through an instrumentality of war. *Williams*, 2022 WL 4134316, at *7. A military board decision is "flawed and in violation of the APA [if] the Board did not consider or respond to an argument that does not appear frivolous on its face and could affect the Board's ultimate disposition." *Thompson v. United States*, 119 F. Supp. 3d 462, 468 (E.D. Va. 2015) (internal quotation marks and citations omitted). Relying on the same facts discussed above, Cumbie argued that his PTSD was a disability incurred as an instrumentality of war, a combat-related disability which would entitle him to CRSC. *See* AR, at 195-98. Yet, at no point in the decision did the AFBCMR

conduct this substantive analysis.  Its only reference to "instrumentality of war" was a boilerplate recitation of the standard.  Nothing in the decision explains, on the merits, why exposure to IEDs and IRAMS while deployed in Iraq could not qualify.  Having provided credible evidence of such exposure,[20] Cumbie was entitled to this analysis.  Because the AFBCMR did not provide it, the decision is flawed and violates the APA.

On a final note, the Court addresses the Secretary's attempt to distinguish VA and PEB standards from the one applied by the AFMCBR.  It may be undisputed that the VA and PEB use different standards.  But that does not insulate the AFBCMR's errors from scrutiny where it fails to support a decision applying CRSC criteria.  Put another way, just because the VA and PEB use different standards for determining a combat-related disability than the AFBCMR does not mean the AFBCMR is automatically excused from erroneously determining that a disability—that might otherwise qualify under CRSC program criteria—is not combat-related.  *See generally Olive v. United States*, 165 Fed. Cl. 541, 549 (Fed. Cl. 2023) ("A disability can be service-connected and eligible for VA disability and [DoD] medical retirement pay without being combat-related for the purposes of [CRSC]."); *but see* AR, at 205 (requiring the AFBCMR to make "[a] determination of combat-relatedness . . . with respect to each separate disability").  The AFBCMR must make an independent determination under its own standard.  It may reference VA and PEB findings in its analysis, but it should not view either as dispositive.  *See* AR, at 208 (requiring the AFCBMR to "weigh[] in relation to known facts and circumstances . . . [a]ll relevant documentary information" and determine "whether a disability is combat-related . . . based on the preponderance of available

---

[20] The observations in footnote 19 apply with equal force here.

documentary information"). Nor can it hand wave away such findings solely on the basis that they employ different standards without explaining why a different result is necessary. The AFBCMR cannot act outside of its statutory authority then seek refuge from critique by arbitrarily asserting that its standard is more rigorous than others—an assertion with no explanation as to how it is more rigorous and how such rigor requires a different outcome—particularly when the CRSC application at issue raises questions as to whether the AFBCMR standard is satisfied.

     *C. The AFBCMR Decision is not based on substantial evidence.*

     Because structural errors abound as explained above, reasonable minds would not accept as adequate the evidence relied upon in the AFBCMR Decision to support a non-combat-related determination. The issue is not whether the AFBCMR is able to agree or disagree with a CRSC applicant's contentions or other military findings but whether the AFBCMR Decision is supported by substantial evidence. The Court is not naïve to cases where a military board may adequately determine that PTSD is not combat-related. *See King*, 149 Fed. Cl. at 275-76. But when a board does so, the decision must be supported by substantial evidence, lest it be set aside. Here, the AFBCMR "ignored" conflicting evidence and "unreasonably construed" the dispositive effect of the advisory opinions. *Pearl v. United States*, 111 Fed. Cl. 301, 311 (Fed. Cl. 2013) (internal quotation marks and citation omitted). At the very least, the AFBCMR could have grappled with the medical records, testimony, and VA and PEB findings and explained why it found other evidence in the record, including the opinions, more compelling or credible. Moreover, because they, too, applied an erroneous standard, the opinions relied upon by the AFCBMR (1) cannot carry the dispositive effect that

Secretary suggests and (2) must be assessed in light of that deficiency. All things considered, the AFBCMR Decision must be set aside.

*     *     *

In reaching its conclusion, the Court emphasizes that it takes no position on—and makes no assumptions regarding—the ultimate question of whether Cumbie is entitled to CRSC. Its limited role, as noted earlier, focuses on the application of the correct standards to ensure decisions are not arbitrary or capricious. Whether the Court would have reached the same result on the merits is irrelevant so long as the decision applies the relevant factors and avoids clear errors. *Ohio Valley*, 556 F.3d at 192.

## IV. CONCLUSION

For the foregoing reasons, Cumbie's Cross-Motion for Summary Judgment is **GRANTED**, and Defendant's Motion for Summary Judgment is **DENIED**.

A separate order consistent with this opinion will issue.


Date: September 26, 2025

_____/s/_____
Charles D. Austin
United States Magistrate Judge
